Beckner v. Maxim Crane Works is up for argument next. Mr. Stephenson. Good morning, Your Honors. My name is Chris Stephenson here today on behalf of Beckner's. This case is before this court on appeal from the District Court on a summary judgment ruling where summary judgment was granted for the defendant Maxim Crane. The District Court erred in granting summary judgment. They held that Maxim Crane's operator, Emmett Pugh, was a co-employee of Jason Beckner, making workers' compensation the exclusive remedy for the Beckner's injuries. The District Court improperly weighed evidence presented to it in a variety of ways. At first there was a 12b1 motion to dismiss, followed by a summary judgment motion. What happened was the court said we have jurisdiction over this case under diversity, and therefore they denied the 12b1 motion and decided to hear the summary judgment standard. As I'm sure this court is well aware, a summary judgment standard requires a de novo review, and it also requires all facts to be construed in favor of the non-moving party, which is the Beckner's here. We have a couple different tests that Indiana applies to these situations in trying to determine whether there is, in fact, a co-employee status. The first test is under the Moberly case, which is an Indiana Supreme Court 2001 case. There are ten factors under the Moberly case. There is also the Hale case, which is a 1991 Indiana case that has a seven-factor test. Which standard is better? Which should the District Court have applied, and why? From our position that the two tests are interrelated, we obviously argued the Moberly because we feel like that is the more appropriate test to use. It tests really whether there is an independent contractor involved, and if there is an independent contractor involved under the Couch case, you can't be both an independent contractor and a borrowed employee at the same time. And so I think the proper analysis here is to start off with the Moberly ten factors test. And in just looking briefly at the facts applied to the test under Maxim, the crane company was engaged clearly in a distinct occupation or business. It operated cranes. Commercial Air, who was actually building the house, has its own distinct company. It's an HVAC company. It has nothing to do with crane operation. Maxim, crane operation is obviously a specialized service. It required training and experience. The crane operator, he has to have his own Maxim drives its crane to the job site. It sets up its crane, and then it has its own rigging that it brings to the job site as well. One very important factor is this was one day only. This was not a continuing, ongoing relationship. The crane was rented for one day only. Maxim was paid by the job. Maxim clearly had more experience setting these roof trusses compared to Commercial Air. The Commercial Air workers who were there setting the trusses were completely inexperienced in setting trusses. This was a situation where their employer, Commercial Air, decided that he was going to use his crew, which is normally an HVAC company, to set the roof trusses. So these roofers were relying on the crane operator to do the job safely. The crane, unfortunately, did not do the job safely. There's evidence that the crane was taking the trusses up in a very fast manner, was banging the trusses into each other, was loosening the bracing, and that eventually led to the trusses collapsing and injuring Mr. Bechner. So just under those factors alone, we can see that, you know, clearly there's a the crane company as an independent contractor. There is the contract, which we see that Maxim Crane points to, and their argument is, well, we have this in writing that we've created this employer- employee relationship through the fine print on the back of this agreement. I think it's important to look at the title of the agreement. It's not an employment agreement. It's a short-term service agreement. Even the title of the agreement itself screams that this is not an employee relationship. This is simply a one-day job where the crane shows up, it's supposed to perform the work, and then is going to leave the job site. The title of this, the short-term service agreement, is also important because under the Couch case, they looked at the relationship between this B&B trucking company and the Postal Service. And the court said that you can't have a situation where you have an independent contractor and you have a situation where they're a borrowed employee. So basically what I'm saying is that here we have the crane that is an independent contractor, therefore they cannot be also a borrowed employee. And the Couch case says you can't have that because you're setting up a situation where it's a heads-I-win, tails-you-lose approach. And this court said it's both unfair and doctrinally incoherent. And if the underlying case, the district court case, is allowed to stand, then indeed we've set up a situation where we have a crane company, it's an independent contractor, but it's also a borrowed employee. And in that situation, you can end up with a situation where, for example, in Couch, where the Postal Service says, well, it's not our fault if we hurt somebody else. That's an independent contractor relationship. But when it benefits the Postal Service to have a borrowed employee in that case, they said, oh, well, now it's a borrowed employee. And this court has said that that's not acceptable. In terms of the short-term service agreement, we also cited an additional authority to the Diltz v. Maxim Crane case. This was an Eastern District of Kentucky case from 2009. And there the court made specific mention of this idea that whether a contract can actually control an employer-employee agreement, or not agreement, employer-employee situation or relationship. And there the agreement status cannot be made to stand or fall on the basis of paperwork. Here, the crane company, Maxim, can't create an employee relationship circumventing the law by making a customer sign a boilerplate agreement on the job site. With that, I'll rest and reserve some time. Thank you. Certainly, counsel. Mr. Sanders. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. The District Court in this matter properly granted summary judgment to Maxim Crane Works when it determined as a matter of law that Maxim Crane Works' operator was a co-employee of the appellant Jason Beckner that day. And therefore, Mr. Beckner's sole recourse was through the Indiana Workers' Compensation Act. Specifically, the District Court, sitting in diversity, correctly applied the Indiana Supreme Court's holding in Hale v. Kemp, which set forth a seven-factor test to determine whether a defendant was a co-employee of the injured party for purposes of the act. So, Mr. Sanders, your argument is we use Hale, not Moberly? It would be, Your Honor, and I would point out that the District Court noted that, I believe, in a footnote. They're both Indiana Supreme Court tests, and in the footnote, it notes that the test for Moberly is whether or not someone's an independent contractor versus an employee. And as I was going to argue a little bit later, I think it's important to bring up now, in Moberly, there were a couple of cases referenced by the appellants in this case that applied the Moberly test. And in those tests, one was the building of a barn where someone said, Go out and build my barn, and I'll pay you after it's done. That person was injured, and they said, Hey, I want liability. No, no, no, you're an independent contractor. And so there was that analysis there. The second analysis, I believe, was a concrete cement truck driver, and his job was to get a ticket, deliver the concrete. There was no direction as to how the concrete was to be poured, and he was paid once the work was done. In this case, Your Honor, Hale v. Kemp, the question is whether or not, and the District Court noted this correctly, you have someone who's already got an employer as a co-employee of someone else. You know, I take Mr. Stevenson's argument from the briefs and this morning to be, whether you apply Hale or Moberly, they win, or at least there's a dispute of fact, and it should go back to a jury. Is your position is not, even though you prefer Hale, that even if we went with the Moberly test or advised the District Court to be using that test, you don't win under that? I believe that we do, Your Honor, because in either the Moberly test or the Hale test, the most important aspect of both of those tests is the element of control. And in this case, I think it's very important to look at just going beyond the contract for a moment, where the contract says, Equipments and persons operating and maintaining equipment, including Maxim's employees, are under customer's exclusive jurisdiction, possession, supervision, and control. And then if the crane equipment is furnished with an operator, the services of such operator will be performed under the complete direction and control of the customer and shall be considered the customer's employee. Does the crane operator's manual, though, conflict with that? I don't think it doesn't conflict. It's a safety manual that tells the crane operator that he's responsible for operating the crane safely. But let's go to the facts of this case. Let's ignore the contract for a minute that the owner of Commercial Air signed, Tim Gatewood signed. No, no, no, no. Let's go back to the manual that Brennan asked about. You know, the manual gave Pew the power to stop and refuse to operate the crane to ensure safety. So while Pew was working with Commercial Air at that site, was he required to abide by that manual? He was, Your Honor. He was required to operate the crane safely in accordance with the manual. Mr. Pew did testify as part of this case, and I believe it was in an affidavit, that he believed he had the authority to stop the lift if he believed the lift was unsafe, which I think is consistent with the manual. But he did not believe that he had the authority to stop the entire job. And when you look at control and when we look at the facts surrounding this, let's look at what happened that's in the facts of our case. Mr. Pew showed up, and Mr. Gatewood testified that when Mr. Pew got to the job site, he discussed where his location should be, what the radius of the crane was, where the center pin location should be. It's also uncontested, and this is the part that we would submit. There's no disagreement of facts here. I think the appellant's brief, we've read it several times. Those facts kind of mesh with our facts. There's no real dispute of facts. When Mr. Pew got to the site, he was operating the crane. Tim Gatewood, the owner of Commercial Air, testified that he was the rigger of the crane. He decided, I'm sorry, he or Commercial Air employees rigged the roof trusses to the crane. Commercial Air employees decided what roof trusses were going to be picked up by the crane and then rigged those roof trusses to the crane. But it didn't stop there. After the trusses were roofed, there was evidence that they signaled for the crane operator to lift the trusses, and then they directed the crane operator, using hand signals, to move the roof trusses over to where they're being installed. It was Commercial Air employees that would grab the tag lines and direct them in, and then the roof trusses were installed by Commercial Air employees. In either Moberly or Hale, that is the control over the means and the results reached. In addition to that, Your Honors, when it was Commercial Air that told Mr. Pew when he was finished for that day, and after Mr. Pew began taking down his crane and after the roof trusses collapsed, it was Commercial Air that told them to set the crane back up and to go over and lift the roof trusses off of Mr. Beckner. And I would note that there's some argument back and forth, and, of course, being a summary judgment that the non-moving party is entitled to facts to their advantage, and I would suggest that one of the arguments was, well, Mr. Pew was moving too fast. He was told several times to slow down. But the district court correctly noted that that is only one more fact showing that Commercial Air controlled what Mr. Pew did that day, by telling him slow down, by allegedly telling him slow down several times, stop hitting trusses. In addition to that, I would add to this that the Hale v. Kemp case, the Indiana Court of Appeals has analyzed it and applied it five separate times as it applies to crane operators. And in each of those five cases, which we cite in our brief, each time the Court of Appeals held that the crane operator was a co-employee, the worksite employee that day, leaving the Workers' Compensation Act as the remedy. So it's something that's not necessarily – we have an Indiana Supreme Court case. We have five Court of Appeals instances with regards to crane operators applying it. And I would also suggest to the Court that there are three cases, and I believe it's Argybright, Johnson v. Poindexter, and Verma v. DT Carpentry, that applied the Hale test after the Moberly decision came out. And how did they come out? They still came out, Your Honor, holding that the crane operator was a co-employee of the worksite employee. Are those three an additional to the five, or three as part of the five? Three as part of the five, Your Honor. Thank you. Yes. The other thing we talked earlier, I heard the counsel argue that the district court weighed facts. I think this court can review the briefs and see that the facts are nearly similar. There's not a dispute of facts. There's not a dispute as to who was telling Mr. Pugh what was going on that day or who was to direct the trusses and everything else. And, in fact, I would submit that the appellants didn't designate what genuine issues and material fact precluding summary judgment was as required under Local Rule 56-1. The Supreme Court held Moberly is when the issue is versus independent contractor status, employee versus independent contractor. Whether a person was an employee or two different employers, that's Hale, which is what we're arguing here. With the remaining few moments that I have, I would like to address the appellant's argument that Couch v. United States in this case demands reversal. I would submit that that involves the application of Illinois law, not the Indiana Supreme Court case or the Court of Appeals crane operator case precedence here. But it does recognize two tests under Illinois law. Number one, direct control, common law test, and number two, the Bellamine test. And I think under either one of those circumstances that Maxim Crane has satisfied it here. This court in Couch said in this case both parties agreed that the Postal Service was not a borrowing employee under the common law test because it did not exercise control over the manner of Couch's or his fellow B&B drivers' work. In that case, they went and picked up mail, but then B&B trucking and that driver were free to deliver the mail how they saw fit. In this case, we don't have that. We have a crane operator who says, I'll lift what you tell me to, I'll put it where you tell me to do it, I'll set it down, and I'll let you install it. Tell me when we're done. In your last 30 seconds, do you want to address this Rule 28J submission on the Diltz case from Kentucky? I do, Your Honor. It came in midday yesterday. I did take a look at it. It's an Eastern District of Kentucky case. It's 15 years old. It is Maxam as the defendant, but there's a distinction there as to what Maxam argued. And I think one of the arguments that was raised was, Maxam was, they didn't raise, was that Maxam was working under a different contractor than what the worksite employee was. And in this case, there was only commercial air people on the site, and that's who Maxam was working for. Thank you, Your Honors. Thank you, Mr. Sanders. Anything further, Mr. Stephenson? I think the question about the crane operator manual is important to focus on because the crane operator manual does certainly create questions of fact specifically on this issue of control. You have a manual that is designed to tell the crane operator how to do the lifts. The crane operator manual specifically says that the crane operator has the ultimate authority over safety for the jobsite, and that's exactly what we're concerned about here is it was job safety. In terms of this idea that just because Maxam had some input in where they were setting up the crane and how they were doing the lifts, the fact that there was cooperation between the parties doesn't automatically mean that one of them was controlling the other. And, in fact, Mr. Pugh testified that he actually did walk the jobsite and did provide input. There are facts in dispute, despite what Mr. Sanders has indicated. The facts in dispute, for example, over control, they're completely differing stories from the roof workers compared to what the crane operator was saying. The roof workers told the crane to slow down. The crane operator slowed down for a period of time and then started putting the lifts up as quickly as he was before, disregarding the instructions from the roofers. There's also a question of fact with regards to, and Mr. Pugh in that situation disagrees with that. He believes that he was not disagreeing with the roofers, that he was basically doing everything they told him to do, and that's not what the record shows with the terms of the roof workers and their deposition testimony. The roof workers also indicated that there was a period of time they had eight or nine trusses up and the crane stopped, and that was done under Mr. Pugh's direction. Mr. Pugh thought they should add some more bracing, so he stopped the lift, allowed them to do some more bracing, and then proceeded to continue with the lift. Do you want to respond to Mr. Sanders' point about Local Rule 56.1? Yeah, Local Rule 56.1 in terms of a summary judgment standard. Right, the delineation of genuine issues of material fact. He says that wasn't complied with. Yes, it was complied with because we had a 12B1 motion that was still pending before the court at the time. We made specific reference. We designated evidence. There's generally a complete overlap in the designation of evidence between the summary judgment ruling and the motion and the 12B1. Do you point to the sequence of the filing of the motions? I would point to both. I think the sequence of the filing, when we filed our response to the motion for summary judgment, the 12B1 motion to dismiss had not been ruled upon yet, and therefore we didn't really have an opportunity to know how the court was going to go with diversity jurisdiction. Thank you. Thank you, counsel. The case is taken under advisement.